MATTHEW
DILLON

Digitally signed by
MATTHEW DILLON
Date: 2024.02.28 14:28:19
-06'00'

AO 106 (Rev. 04/10) Application for a Search Warrant    AUTHORIZED AND APPROVED/DATE:

# UNITED STATES DISTRICT COURT
for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| RESIDENCE KNOWN AS 2288 COUNTY ROAD 1333, BLANCHARD, OKLAHOMA, INCLUDING THE CURTILAGE AND ANY OUTBUILDINGS AND VEHICLES | ) Case No. M-24- **190** -SM |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the ____WESTERN____ District of ____OKLAHOMA____, there is now concealed *(identify the or describe the property to be seized)*:

See Attachment "B"   which is incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339B | Providing material support or resources to designated foreign terrorist organizations |
| 18 U.S.C. § 875(c) | Transmitting a threat in interstate commerce |
| 18 U.S.C. § 2251 | Sexual exploitation of children |
| 18 U.S.C. § 2252A(a)(2) | Receiving or distributing child pornography |

The application is based on these facts:

See attached Affidavit of FBI Special Agent Bailey J. Kennedy, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_

SA Bailey J. Kennedy, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __3-1-24__

_Judge's signature_

City and state: Oklahoma City, Oklahoma          SUZANNE MITCHELL, U.S. MAGISTRATE JUDGE
_Printed name and title_

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

IN THE MATTER OF THE SEARCH    )
OF THE PREMESIS KNOWN AS       )
2288 COUNTY ROAD 1333          )    M-24-190-SM
BLANCHARD, OKLAHOMA 73010,     )
INCLUDING THE CURTILAGE AND    )
ANY OUTBUILDINGS AND VEHICLES  )

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Bailey J. Kennedy, Special Agent with the Federal Bureau of Investigation, being

duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI) Joint

Terrorism Task Force (JTTF). I have been employed as a Special Agent with the FBI since

June 2022, and I am currently assigned to the Oklahoma City Division. Since becoming a

Special Agent, I have been involved in a variety of investigative matters, including

investigations involving international terrorism, some of which involve the radicalization

of United States citizens and those individuals providing material support or resources to

Designated Foreign Terrorist Organizations (FTO) in violations of 18 U.S.C. § 2339B.

2.    I have personally participated in the investigation set forth below. The facts

in this affidavit come from my personal observations, my review of documents related to

this investigation, oral and written communications with others who have personal

knowledge of the vents and circumstance described herein, a review of public source

information including information available on the Internet, my training and experience,

and information obtained from other agents and witnesses. This affidavit is intended to show there is sufficient probable cause for the requested warrant, but it does not set forth all my knowledge on the matter.

3.      This affidavit is made in support of an application for warrant to search the residence of **LANDON KYLE SWINFORD (SWINFORD)**, 2288 County Road 1333, Blanchard, Oklahoma 73010 (**SUBJECT RESIDENCE**), in the Western District of Oklahoma (more particularly described in **ATTACHMENT A**), and seize evidence related to a violation of 18 U.S.C. § 2339B (providing material support or resources to designated foreign terrorist organizations), 18 U.S.C. § 875(c) (transmitting a threat in interstate commerce), 18 U.S.C. § 2251 (sexual exploitation of children), and 18 U.S.C. § 2252A(a)(2) (receiving or distributing child pornography), more particularly described in **ATTACHMENT B**.

4.      An individual violates Title 18, United States Code, Section 2339B by "knowingly providing material support or resources to a foreign terrorist organization or attempts or conspires to do so."

5.      An individual violates Title 18, United States Code, Section 875(c) if he or she "transmits in interstate or foreign commerce any communication containing any threat to kidnap and person or any threat to injure the person of another…"

6.      An individual violates Title 18, United States Code, Section 2251 if he or she "…knowingly employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transport and minor in or affecting interstate or foreign commerce, or in any in any Territory or Possession of the

2

United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

7.      An individual violates Title 18, United States Code, Section 2252A(a)(2) by knowingly receiving or distributing child pornography or any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including a computer.  The facts comprising the basis for this affidavit are personally known by me or have been relayed to me directly and indirectly by others familiar with this investigation, including FBI personnel and other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only facts that I believe as necessary to establish probable cause to believe that violations of the criminal statues identified in paragraph 3 and below have occurred.

## PROBABLE CAUSE IN SUPPORT OF MATERIAL SUPPORT OF A DESIGNATED FOREIGN TERRORIST ORGANIZATION

8.      Law enforcement, including the FBI, is conducting a criminal investigation into **SWINFORD** in the Western District of Oklahoma.

9.      On or about July 11, 2023, a New York City Police Department (NYPD) detective reported an undercover employee (UCE) with NYPD had engaged in communications with an online Instagram user named USAMA SAJID AL-HASHIM (as

shown below, an alias for **SWINFORD**) form approximately May 2023 to present over multiple communication platforms.

10.    On or about May 18, 2023, **SWINFORD** made contact with the UCE via Instagram messenger after the UCE liked one his Islamic State of Iraq and al-Sham (ISIS)[1] propaganda postings on Instagram. Documented communication showed **SWINFORD** stated he had been a non-Muslim for eighteen years and resided in Oklahoma.

11.    NYPD reported that in subsequent communications with the UCE, **SWINFORD** expressed a desire to travel overseas to fight with ISIS, suggesting the UCE and him travel together. If unable to travel, **SWINFORD** suggested, "And if we can't leave, inshallah[2] we will create a battlefield here. The kufr[3] will tremble beneath our boots either way."

---

[1] On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.*, "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

[2] In'sha'allah means "God willing" when translated literally. It is based on the Quran's teaching that nothing occurs apart from God's will.

[3] Kufr means non-believers, referring to people who do not believe in the Muslim faith.

12.     On or about June 15, 2023, via text from the phone number +1 (405) 423-9059 ("**SWINFORD's** cell phone") (linked to **SWINFORD** as shown below) to the UCE, USAMA SAJID AL-HASHIM stated, "I wish there was like a super rich Muslim that's balling in cash that could just help the brothers who want to make hijrah[4]."

13.     On or about June 17, 2023, **SWINFORD** sent the UCE a text message, from **SWINFORD's** cell phone, of four videos of ISIS fighters executing and beheading captives.

14.     On or about June 17, 2023, USAMA SAJID AL-HASHIM - texted the UCE from **SWINFORD's** cell phone, "If I can't go to Sham [Syria] for Jihad[5], I'll just go to Walmart."

15.     On or about June 18, 2023, **SWINFORD** asked the UCE via text from **SWINFORD's** cell phone if the UCE had been able to find an ISIS recruiter, commenting that before 2020 ISIS would contact Muslims proactively, but **SWINFORD** "sucked" at Arabic, so he was not sure. **SWINFORD** also texted, "Not being a Muslim for 18 years and still living with your parents makes everything a bit more complicated but I'm trying and I have my heart set on Jihad fisabilillah [in the cause of Allah]."

---

[4] Hijrah is an Arabic term meaning migration to an Islamic Land. In my knowledge and experience, ISIS supporters commonly refer to hijra as leaving Dar al Kufr (Land of the Non-believers) to emigrate and join ISIS overseas.

[5] Jihad is the spiritual struggle within oneself against sin or a struggle or fight against the enemies of Islam.

16.     On or about June 18, 2023, **SWINFORD** texted the UCE, from **SWINFORD's** cell phone, that an unspecified contact told him he could travel to Tunisia. On or about July 21, 2023, the FBI served Meta Platforms, Inc. ("Meta") a federal search warrant for the multiple social media accounts utilized by **SWINFORD**.[6] This information was later corroborated as detailed in paragraph 30.

17.     On or about June 20, 2023, **SWINFORD** texted the UCE, from **SWINFORD's** cell phone, a picture of a shotgun that he said belonged to his father. Two other shotguns were visible in the photograph. **SWINFORD** stated these weapons "do have a lot of recoil but they do wonders on Kuffar [infidels]." **SWINFORD** also claimed to have shot pistols and a small .22 caliber gun, but "sadly" nothing as big as an AK-47.

18.     On or about June 28, 2023, **SWINFORD** texted the UCE, from **SWINFORD's** cell phone, his manifesto. The following are excerpts from the manifesto sent to the UCE:

- "I swear to Allah that my loyalty and service is to him and to the Islamic State. I am a servant of Allah, my duty is to fight for him and my Ummah[7]. My brothers and sisters suffer every day, the kuffar[8] will get that in return, in'sha'allah."

- "The Islamic State will expand and I swear that I will fight until the law of Allah is established everywhere."

---

[6] On or about July 21, 2023, a federal search warrant was issued to Meta Platforms, Inc. The search warrant was for the data for the following accounts (represented with their unique user ID) that were operated by **SWINFORD**: 100093180627724, 59655274772, 59815267610, 59847640450, and 60141102212.

[7] Ummah means the whole community of Muslims bound together by ties of religion.

[8] Kuffar means non-believers, referring to people who do not believe in the Muslim faith.

- "Allah guides me and His other servants to jihad. Our Lord will get our loyalty until we breathe our last breath and enter paradise."

- "For the sake of Allah, I will slaughter kuffar alongside my brothers. You must accept it, this war will end with all of the kuffar destroyed and we will be victorious."

- "We as believers need to advance on the armies of kuffar. we must slaughter their soldiers and destroy their might."

- "To cast terror into the eyes of the enemies of Allah is beautiful thing. I do not care if the world calls me a terrorist, I will cast terror for the sake of Allah."

19.     On or about June 25, 2023, **SWINFORD** texted the UCE from **SWINFORD's** cell phone a photograph of himself with and ISIS flag in the background. He also sent a picture of himself wearing a headscarf and holding a knife as depicted below:



20.     On or about July 11, 2023, FBI submitted an emergency disclosure request to Verizon Wireless (Verizon) for telephone number +1 (405) 423-9059 (**SWINFORD's** cell phone), and Verizon confirmed they provided service for the telephone number. Verizon listed **SWINFORD's** adoptive mother, Tara Swinford, as the subscriber for the telephone number with a listed address of **SUBJECT RESIDENCE**. The telephone

7

number is associated to an iPhone XS, Space Gray in color, with 256GB of memory, and an IMEI number of 357206092881426 (**SWINFORD's** cell phone). On approximately July 11, 2023, a one-time ping at approximately 2:57 PM CST, determined the telephone number was located at Latitude: 35.084747 and Longitude: -97.732261. The ping was located near Middleberg, Oklahoma, which is approximately one mile from **SUBJECT RESIDENCE**. The ping had an accuracy of approximately 6,000ft.

21.    On or about July 11, 2023, FBI searched for the +1 (405) 423-9059 telephone number in a database, which listed "LANDON" as the associated name for the +1 (405) 423-9059 number.[9]

22.    On or about July 11, 2023, FBI submitted an emergency disclosure request to Meta for Facebook account 100093180627724 which was found to be associated with **SWINFORD** and is referred to herein as **ACCOUNT 3**[10]. Meta listed the account holder as Usama Sajid Al-Hashim, date of birth March 3, 2005, which is the same date of birth as **SWINFORD**, and the account being registered with the +1 (405) 423-9059 number (**SWINFORD's** cell phone). Meta returns also listed static IP address 158.62.189.163 registered to **ACCOUNT 3**.

---

[9] On or about July 16, 2023, a search warrant for pen register, trap and trace, and "ping" for **SWINFORD's** cell phone was issued by the Court and served to Verizon by the FBI. The warrant was extended multiple times, with the most recent warrant being issued on or about October 11, 2023, and expired on January 8, 2024. Data collected from the warrant has shown **SWINFORD** is the user of the phone and had been using the phone to communicate with the UCE.

[10] It is called **ACCOUNT 3** to be consistent with the numbering used in prior search warrant applications.

23.    An open-source search determined IP address 158.62.189.163 was owned by Oklahoma Electrical Cooperative (OEC) Fiber. OEC Fiber provides internet, television, and, telephone service to residential and business customers.  FBI submitted emergency disclosure request to OEC Fiber and was advised the referenced IP address belonged to Steven Swinford, the adoptive father of **SWINFORD**, with a listed address of the **SUBJECT RESIDENCE**.

24.    On or about July 11, 2023, FBI confirmed an Oklahoma Driver's License associated with **SWINFORD**, which listed the date of birth of March 3, 2005, with a residence at the **SUBJECT RESIDENCE**. The Oklahoma driver's license photograph of **SWINFORD** appeared to be the same person in the photograph **SWINFORD** texted the UCE in paragraph 17.



25.    Open-source research of **SWINFORD's** adoptive mother's Instagram account (@taraeatonswinford), identified **SWINFORD** as her eighteen-year-old son. On June 24, 2021, **SWINFORD's** adoptive mother's Instagram account posted a picture of **SWINFORD** with a white 1996 Ford F-150 (SWINFORD's vehicle) and stated the pickup was given to **SWINFORD** as a gift from his grandfather. There are multiple other posts

showing **SWINFORD** in **SWINFORD's** vehicle on his mother's Instagram and Facebook accounts.



26.    Oklahoma Tax Commission showed a white 1996 Ford F-150, bearing Oklahoma license plate EHT750, as registered to Steven Swinford at the **SUBJECT RESIDENCE**.

27.    On or about July 12 and July 13, 2023, FBI surveillance observed **SWINFORD** entering and operating **SWINFORD's** vehicle throughout the day. Subsequent FBI surveillance of **SWINFORD** has resulted in the finding that **SWINFORD** is the only person who operates **SWINFORD's** vehicle. **SWINFORD** has not been observed operating any other vehicle.[11]

28.    On or about July 21, 2023, the Court authorized a search warrant to Meta for the following accounts utilized by **SWINFORD**: Instagram account 59655274772

---

[11] On or about July 31, 2023, this Court authorized a search warrant for the installation of a tracker on **SWINFORD's** vehicle. The tracker was installed on **SWINFORD's** vehicle on or about August 2, 2023. The tracker is still in place on the vehicle, with the most recent warrant being issued on or about January 19, 2024.

(**ACCOUNT 1**), Instagram account 59815267610 (**ACCOUNT 2**), Facebook account 100093180627724 (**ACCOUNT 3**), Instagram account 59847640450 (**ACCOUNT 4**), Instagram account 60141102212 (**ACCOUNT 5**). Results from Meta were produced on or about July 24, 2023.

29.    **ACCOUNT 3** had +1 (405) 423-9059 as the verified phone number, the date of birth of March 3, 2005 (**SWINFORD's** date of birth), and an associated IP address of 158.62.189.163 (IP associated with the **SUBJECT RESIDENCE**).

30.    While using **ACCOUNT 3**, **SWINFORD** had bidirectional contact with a known Facebook user on or about June 18, 2023. **SWINFORD** told the user "I still live in America, I want to leave so I can fight for God." The other user replied, "You have to fight for the sake of Allah my brother You can come to Tunisia." This corroborates what **SWINFORD** told the UCE as described in paragraph 16.

31.    FBI analysis of **ACCOUNT 1** revealed that on or about May 19, 2023, **SWINFORD**, using **ACCOUNT 1**, had direct messages with Instagram account user @[******_***]. **SWINFORD** messaged the user, "I would love to move out of this country for jihad." @[******_***] asked **SWINFORD** why he hated America. **SWINFORD** responded, "There are many reasons. 1. Kufr everywhere, I cannot go anywhere without seeing homosexuality. 2. They killed many Muslims and tried to end the Islamic State. 3. They are making it where killing babies is okay. 4. Men who pretend to be women are being allowed into women restroom. 5. It is not Muslim country with no Sharia."

11

12

**32.** FBI analysis of ACCOUNT 4 showed that **SWINFORD** had shared approximately 34 images on the Instagram account. The images that were posted on the page either referenced ISIS and/or acts of violence.





33.    On or about Augusts 1, 2023, **SWINFORD** texted the UCE from **SWINFORD's** cell phone, "My brother I have a chance to commit a small single act of jihad." **SWINFORD** explained he was contacted by his ex-girlfriend, and he had an opportunity to attack her, but changed his mind. **SWINFORD** said the reason he did not attack her is because he would have to perform a sexual act with her which is against his Islamic beliefs. At the time, the FBI believed the attack may be imminent. FBI has identified the individual whom they believed **SWINFORD** was referring. This individual was not currently in Oklahoma and reported that she did not currently have the ability to travel out of state. Through surveillance and a Court-authorized tracker of **SWINFORD's** vehicle and the capability of pinging **SWINFORD's** cell phone, FBI was able to monitor whether **SWINFORD** attempted to go to where this individual was located, which he did not.

34.    On or about August 21, 2023, the FBI served Apple Inc. ("Apple") a search warrants issued by the Court for the data associated with **SWINFORD's** iCloud account, swandonlinford@gmail.com. On or about August 28, 2023, Apple produced results in response to the search warrant.

35.    Analysis of **SWINFORD's** iCloud account showed the account belonged to an iPod, which belonged to **SWINFORD**. The data captured on the return was only information captured a timeframe between early to 2022 to approximately September 2022. The data produced from Apple with from a timeframe where **SWINFORD** was still a juvenile.

36.     Analysis of **SWINFORD's** iCloud account produced multiple videos of **SWINFORD** firing various firearms. The videos of were of **SWINFORD** and his father firing an AR-style firearm at what appears to be a shooting range.

37.     Analysis of pen register data shows **SWINFORD** communicated with the UCE daily, which is corroborated by the UCE, and is his top contact.[12] **SWINFORD** continued to tell the UCE about his desire to perform acts of jihad. On or about August 29, 2023, **SWINFORD** spoke to the UCE via **SWINFORD's** cell phone about the mass shooting event in Jacksonville, which occurred on August 26, 2023. **SWINFORD** stated, "Let's make it a goal to make it every day."

38.     On or about September 24, 2023, **SWINFORD** had a phone call via **SWINFORD's** cell phone, which was recorded. In this phone call, **SWINFORD** made statements about using his vehicle to run over homosexuals. **SWINFORD** told the UCE he had talked to one of his kuffar friends, who told him that **SWINFORD's** vehicle would only be big enough to run over six homosexuals. **SWINFORD** told the UCE that would not be enough [homosexuals].

39.     On or about September 24, 2023, during the same recorded phone call with the UCE, **SWINFORD** stated he was going to make an ISIS allegiance video. **SWINFORD** said he had already written what he was going to say and would record the allegiance video at his fishing spot.

---

[12] As noted, *infra*, **SWINFORD** and the UCE are no longer in communication.

40.     On or about September 25, 2023, **SWINFORD** sent the UCE, via **SWINFORD's** cell phone, a recorded allegiance video. In the video, **SWINFORD** pledged his allegiance to ISIS two times. He called for his brothers to make hijrah and that jihad was the only way to get rid of scum. **SWINFORD** ended his video by burning an Israeli flag with a nasheed[13] playing in the background.

41.     On or about September 30, 2023, **SWINFORD** sent a text using **SWINFORD's** cell phone to the UCE stating he was attending a University of Oklahoma football game. He told the UCE he had looked at barricades and security at the stadium and thought the stadium could be a potential target.

42.     On or about October 3, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cellphone and directed the UCE to **SWINFORD's** public Instagram account, @alamrikimedia. On the account, **SWINFORD** posted a statement that read, "CAST FEAR INTO THE HEARTS OF THE KUFFAR THIS HALLOWEEEN Dress up as your favorite mujahideen and Bomb a synagogue." Another post read, "Spice up your autumn with some cold-hearted JIHAD FISABILILLAH."

---

[13] A nasheed is an Islamic vocal song typically sang without music. Extremists make nasheeds containing language that encourage violence or hijrah.





43.     On or about October 10, 2023, **SWINFORD**, using SWINFORD's cell phone, sent a text to the UCE that he had researched New Orleans as a potential target. **SWINFORD** had calculated the distance from Oklahoma to New Orleans and told the UCE they could scout the area together.

44.     On or about October 13, 2023, the UCE met with **SWINFORD** in or around Norman, Oklahoma. **SWINFORD** utilized his vehicle to drive to the meeting location in Norman, Oklahoma.

45.     **SWINFORD** indicated to the UCE that his preferred plan was to travel overseas for hijrah in the Middle East. **SWINFORD** indicated he still needed to obtain a passport and that his parents maintained documents he would need to complete a passport application. **SWINFORD** also stated that he needed more money to complete such action.

16

The UCE offered an alternative means to travel overseas without a passport (such as the use of a freight ship) and **SWINFORD** appeared to be interested in this option. **SWINFORD** was excited that the "brothers" had liked his bayat [allegiance] video. Given the obstacles of traveling overseas and his lack of money, **SWINFORD's** ability to travel was not believed to be imminent, and this was something he planned to work towards over an extended period of time.

46.     **SWINFORD** indicated his backup plan would be to conduct an attack in the U.S., but he stated there were better targets than Oklahoma. **SWINFORD** suggested that they target New Orleans. There was some discussion about how such a plan would be executed. **SWINFORD** mentioned that he needed to obtain guns for any U.S.-based operation. Based on the UCE's interaction with **SWINFORD**, it appeared there was not an imminent threat of violence from him in the Oklahoma area.

47.     **SWINFORD** did not commit to either plan at the time, nor did he provide a timeline of when he would travel or carry out an attack.

48.     On or about October 15, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that he was going to continue doing research into New Orleans. **SWINFORD** texted the UCE two hyperlinks to two separate YouTube videos on butane-based explosives. **SWINFORD** texted the UCE, "Now imagine an entire U-Haul truck full of it," followed by a photograph of a U-Haul truck. **SWINFORD** told the UCE they needed to get a remote detonator, surround the detonator with propane tanks, and fill a U-Haul up with butane gas. **SWINFORD** told the UCE that propane tanks are available at gas stations for them to use.

17

49.    On or about October 15, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that the UCE would need to figure out if the contact [for hijrah] would be able to get them a ship in Louisiana for the rest of the plan.

50.    On or about October 16, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone a screenshot of articles regarding the death of a six-year-old child in Illinois being stabbed to death for being Muslim.[14] **SWINFORD** later stated he had gone to a restaurant and that he wanted to stab everyone in the restaurant because the entire country should pay for the young child's death. **SWINFORD** continued that the kuffar would pay, and they [**SWINFORD** and the UCE] would slit every single throat until they [**SWINFORD** and the UCE] would be standing knee deep in blood and their brothers and sisters were avenged for the sake of Allah.

51.    On or about October 16, 2023, **SWINFORD** text the UCE via **SWINFORD's** cell phone that Mardi Gras in New Orleans took place in February. **SWINFORD** texted he would continue to research the streets to see where the celebration takes place, and he would also check if the New Orleans Pride Parade was anywhere near it.

52.    **SWINFORD** texted the UCE via **SWINFORD's** cell phone that he had already picked a target. **SWINFORD** told the UCE he wanted to attack the "Voodoo Temple" and that his plan was to douse the place in gasoline and place ten to twenty butane

---

[14] On or about October 11, 2023, a six-year-old Muslim boy and his mother were stabbed by their landlord in Illinois. The landlord was charged with the murder of the boy and attempted murder of the mother. The incident is currently being investigated as a hate crime, the victims were targeted due to their religion and Palestinian ethnicity.

cans for an explosion. The UCE inquired when **SWINFORD** wanted to execute the plan. **SWINFORD** told the UCE they would need to recon the location together first but thought the attack could take place in 2024. **SWINFORD** said he wanted to make sure that everything in the temple would be destroyed and would not mind killing the voodoo priestess if the opportunity presented itself.

53.    On or about October 17, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that he had an idea for the "voodoo temple" and that they would need two to five more brothers with them for the "operation." On or about October 18, 2023, **SWINFORD** explained his plan would be to enter the temple just before closing and they [**SWINFORD** and the UCE] along with the brothers would gather all the people in the temple and put them on their knees. They would then cover all the windows and a brother would lock the exits and stand guard. One of the brothers would then start video recording **SWINFORD** executed the priestess while the brothers executed the other people. After the executions, they would douse the temple with fuel and "put some of those homemade things I showed you in the videos [referencing the YouTube videos as described in Paragraph 46]."

54.    On or about October 19, 2023, the UCE inquired via text message why **SWINFORD** was still studying for the aviation vocational school and wanted to know if **SWINFORD** was serious about his plans. **SWINFORD** told the UCE attending the school would be a "cover." **SWINFORD** said he knew gathering supplies for his plans would take time and he needed to do something to divert his parents' attention.

55.    On or about October 19, 2023, the UCE sent a text to **SWINFORD's** cell phone about serious news he had received from the brothers. The UCE told **SWINFORD** a cargo ship in New Orleans would leave from New Orleans in approximately 40 to 45 days and it would cost $550 to travel. The cargo ship would then transport them overseas to Egypt and from there, brothers would take them to Sanaa, Yemen.

56.    On or about October 19, 2023, **SWINFORD** texted the UCE via SWINFORD's cellphone that he would begin coming up with a cover story to travel to New Orleans to tell his parents. **SWINFORD** said since he still lived with his parents, he usually tells them where he goes during the day so he would fabricate a believable story of why he would travel to New Orleans.

57.    On or about October 19, 2023, the UCE texted **SWINFORD** that the brothers would need a down payment for hijrah to make sure he was serious about travel. **SWINFORD** asked the UCE how to make the payment and questions regarding the use of money applications or money services such as Western Union or MoneyGram.

58.    On or about October 19, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that they did not have to do the bombing plan and that he would just make hijrah instead. **SWINFORD** stated making hijrah would fulfill their obligation without excuses since making hijrah is an order. **SWINFORD** told the UCE that they could conduct the bombing plan in New Orleans if it could be successfully done without jeopardizing making hijrah. **SWINFORD** said the mindset would be to conduct the attack if able, but the main goal would be making hijrah.

59.    On or about October 19, 2023, **SWINFORD** asked the UCE, via text message, for explicit directions on how to use a money service like MoneyGram or Western Union. After explanation of how to use the service, **SWINFORD** told the UCE there was a Western Union in a Wal-Mart located in Norman, OK. **SWINFORD** said he would be in Norman, OK on Wednesday (October 25, 2023) he would go to make the money transfer for hijrah.

60.    On or about October 20, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone and asked the UCE to give him step-by-step directions how to make the money transfer so he would not do anything wrong. **SWINFORD** also asked the UCE if he could just use cash instead of a debit card because he did not want his mother to see changes in his bank account.

61.    On or about October 20, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that he had made a cover story to tell his parents on why he would be traveling to New Orleans. He would tell his parents he was going to stay at a friend's house for a few days. **SWINFORD** said once he got on the boat in New Orleans, he would destroy his phone because he did not want to be tracked and figured his parents may make a missing person report.

62.    On or about October 21, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone that his mother had come into his bedroom looking for a Halloween costume for his younger brother. **SWINFORD** believed that his mother must

have found his thobe and kufi[15] in his room because they were missing. **SWINFORD** did not know how his parents would handle finding the items but said he would not tolerate his parents trying to convert him back from Islam to Christianity. **SWINFORD** said he would lie to his parents and state the thobe and kufi were for a Halloween costume. **SWINFORD** told the UCE he believed he would get in trouble with his parents.

63.    On or about October 21, 2023, **SWINFORD** texted the UCE via **SWINFORD's** cell phone stating he had located more Western Union locations for the transaction. **SWINFORD** asked the UCE if $100 would be enough for a down payment because he wanted to save money for supplies for the journey.

64.    On or about October 22, 2023, all conversations, to include text, telephonic, and social media, stopped between **SWINFORD** and the UCE. The pen register and trap and trace data showed the last outgoing data at approximately 2:49 PM on or about October 22, 2023.

65.    From on or about October 23, 2023, to on or about October 25, 2023, the pen register and trap and trace data showed no outgoing communications from **SWINFORD's** cell phone. During the same time frame, the ping of **SWINFORD's** cell phone showed that the device did not leave the **SUBJECT RESIDENCE**. During that time period, there were incoming text messages from the UCE and one incoming phone call, as described below.

66.    On or about October 22, 2023, FBI surveillance observed **SWINFORD** being picked up by his employer at **SUBJECT RESIDENCE**. Later that evening,

---

[15] A thobe is a traditional long sleeve Middle Eastern robe. A kufi is a brimless, short cap traditionally worn in the Middle East.

SWINFORD returned to the **SUBJECT RESIDENCE** in his father's vehicle with his father. Ping data showed that **SWINFORD's** cell phone had not left **SUBJECT RESIDENCE**.

67.    On or about October 25, 2023, FBI surveillance observed **SWINFORD** leave the **SUBJECT RESIDENCE** with his father in his father's vehicle. **SWINFORD** had previously told the UCE that this was the day he was supposed to take an aviation test at the Moore Norman Technology Center. **SWINFORD** and his father returned to **SUBJECT RESIDENCE** a few hours later. Pen register and trap and trace data showed an approximately one-minute incoming phone call between **SWINFORD's** cell phone and a phone number associated to the Moore Norman Technology Center. FBI is unable to determine if this phone call was answered or sent to voicemail.

68.    On or about October 25, 2023, the ping data stopped producing results and gave notification, "CARRIER FAILED TO LOCATE PHONE." **SWINFORD's** cell phone was still an active line but indicated his phone has either been turned off or died.

69.    FBI surveillance was able to determine that **SWINFORD** had left the **SUBJECT RESIDENCE** on or about October 29, 2023, with his parents and younger brother in the vehicle.

70.    On or about November 5, 2023, on or about November 11, 2023, on or about November 15, 2023, on or about November 18, 0223, on or about November 25, 2023, on or about November 27, 2023, and on or about November 28, 2023, **SWINFORD** WAS observed leaving the **SUBJECT RESIDENCE** in **SWINFORD's** vehicle. Data from the tracking device on **SWINFORD's** vehicle showed **SWINFORD** left the **SUBJECT**

**RESIDENCE. SWINFORD** then returns to the **SUBJECT RESIDENCE** where **SWINFORD** is observed exiting his vehicle and entering **SUBJECT RESIDENCE**. **SWINFORD** was the sole occupant of his vehicle on the above-mentioned occasions.

71.    On or about November 16, 2023, **SWINFORD's** mother posted on her public Instagram account a photograph of **SWINFORD** holding an acceptance letter from the Moore Norman Technology Center. The caption on the account stated that **SWINFORD** had been accepted for the aviation mechanic school and would be attending in February 2024.

72.    No new pen register, trap and trace, and ping data has been produced by **SWINFORD'S** cell phone to date.

73.    On or about January 10, 2024, Verizon Wireless verified that **SWINFORD's** cell phone was deactivated on November 25, 2023. Verizon Wireless verified the phone numbers associated to **SWINFORD's** parents were deactivated on December 23, 2023.

74.    On or about January 22, 2023, AT&T verified **SWINFORD's** parents' phone numbers were transferred to AT&T and were still owned by Tara and Steven Swinford. **SWINFORD's** parents' phone numbers were the only two numbers on the account.

75.    On or about February 20, 2024, FBI verified phone number (405) 423-9059 is still not an active line. Database checks show the phone number as still being owned by Verizon Wireless.

24

76.     FBI submits that it is reasonable to believe that **SWINFORD's** parents may have taken **SWINFORD's** cell phone that he used until on or about October 25, 2023, and that it is still in their possession.

77.     On or about February 11, 2024, **SWINFORD's** mother, posted a photograph of her with **SWINFORD** to her public Instagram account. In the caption of the Instagram post, **SWINFORD's** mother wrote, "Well, it's official......Landon is on to his next chapter," and "Today he left to live at my parent's for several days each week because he is starting his vo tech program tomorrow!"

78.     In the same Instagram post mentioned in paragraph 77, **SWINFORD's** mother wrote, "It seems silly that he is only 30 minutes away and it my emotions. I know I can talk to him daily thanks to cell phones."

79.     On or about February 11, 2024, at approximately 3:26 PM, pole camera footage and vehicle tracker data showed **SWINFORD** leaving the **SUBJECT RESIDENCE**. At approximately 4:11 PM, **SWINFORD's** vehicle stopped in the area of **SWINFORD's** maternal grandparents' known residence in Norman, OK.

80.     Open-source research of Moore Norman Technology Center's official website showed classes for the aerospace and aviation mechanic school began on February 12, 2024, with class times beginning at 8:15 AM and ending at 4:15 PM.

81.     On or about February 12, 2024, at approximately 7:23 AM, vehicle tracker data on **SWINFORD's** vehicle showed the vehicle leaving his grandparents' residence and stopping at Moore Norman Technology Center, located at 4701 12th Ave NW, Norman, Oklahoma, at approximately 8:01 AM.

82.    On or about February 12, 2024, at approximately 4:22PM, vehicle tracker data showed SWINFORD's vehicle leaving Moore Norman Technology Center and then stopping at **SWINFORD's** grandparents' residence at 4:49PM. Tracker data showed **SWINFORD's** vehicle did not leave his grandparents' residence for the rest of the day.

83.    On or about February 13, 2024, at approximately 7:26AM, vehicle tracker data showed **SWINFORD's** vehicle leaving his grandparents' house and driving to Moore Norman Technology Center. Physical surveillance observed **SWINFORD** exit his vehicle and enter Moore Norman Technology Center on or about 8:05AM. On or about 4:19PM vehicle tracker data showed **SWINFORD** leaving Moore Norman Technology Center and returning to his grandparents' residence.

84.    On or about February 13, 2024, physical surveillance units observed **SWINFORD** exit his vehicle and holding what appeared to be a cell phone in both of his hands while walking into Moore Norman Technology Center.

85.    FBI believes **SWINFORD** has a new cellphone other than the original cellphone that was being utilized, based on facts mentioned above.

86.    Affiant knows that data between previous cellphone devices can be transferred manually or via digital cloud services. Affiant believes the new cellphone **SWINFORD** possess could contain data or information transferred from his previous cellphone. Additionally, **SWINFORD** could access social media from any electronic device.

87.    Vehicle tracker data on **SWINFORD's** vehicle showed **SWINFORD** followed the same pattern of life between his grandparents' residence and Moore Norman Technology Center throughout the rest of the week to Friday, February 16, 2024.

88.    On or about February 16, 2024, vehicle tracker data on **SWINFORD's** vehicle showed **SWINFORD** leaving Moore Norman Technology Center and returning to the **SUBJECT RESIDENCE**. At approximately 6:55 PM, pole camera footage showed **SWINFORD** arrive at the **SUBJECT RESIDENCE** in his vehicle. At approximately 6:57 PM, pole camera footage shows **SWINFORD** exiting his vehicle and entering the **SUBJECT RESIDENCE**. **SWINFORD** appeared to be carrying a bag with him when entering the **SUBJECT RESIDENCE**.

89.    On or about February 18, 2024, at approximately 2:39 PM, pole camera footage showed **SWINFORD** exit the **SUBJECT RESIDENCE** with what appeared to be a duffle bag. **SWINFORD** entered his vehicle and left the **SUBJECT RESIDENCE**. Vehicle tracker data showed **SWINFORD** arrive at his grandparents' residence.

90.    To date, **SWINFORD** has continued his pattern of life of commuting between his grandparents' house to the Moore Norman Technology Center from Sunday through Friday and then continuing to reside at the **SUBJECT RESIDCENCE** Friday through Sunday.

**PROBABLE CAUSE IN SUPPORT OF SEXUAL EXPLOITATION OF
CHILDREN, COERCION AND ENTICEMENT OF CHILDREN, AND
POSSESSION AND RECEIPT OF CHILD PORNOGRAPHY**

91.    On or about May 19, 2023, **SWINFORD** began speaking with an Instagram
user, @##XXX[16], using **ACCOUNT 1**. Instagram user @##XXX identified himself as a
16-year-old boy named ["John Doe"][17]. **SWINFORD** told John Doe that he was
"Daesh[18]." John Doe asked what brought **SWINFORD** to ISIS and his response was,
"[black flag emoji, finger pointing upwards emoji] for the sake of Allah."

92.    On or about May 19, 2023, while using **ACCOUNT 1, SWINFORD** began
having sexually explicit conversations with John Doe on Instagram. John Doe said, "I will
swallow your face," and **SWINFORD** replied, "You will swallow my dick***." John Doe
said, "I will choke [crying emoji]." **SWINFORD** then asked, "How big is yours?" The
conversation then moved to the two talking about how big and hairy their anuses are.
**SWINFORD** told John Doe, "I know the feelings I have for you are forbidden."

93.    On or about May 21, 2023, using **ACCOUNT 1, SWINFORD** asked if John
Doe liked older or younger people. John Doe said he prefers younger people. **SWINFORD**
replied, "Mhm the younger the better." He further stated, "But you're 16 so here in the
USA I won't get in trouble. but sometimes I see a girl who is 12-14 and she would be so
beautiful." **SWINFORD** also stated, "12-14 is best for girls, but I like you a lot."

---

[16] The Instagram username is known to the FBI but has been redacted to protect the identity
of the purported minor.

[17] The name provided is being protected due to his purported status as a minor.

[18] Daesh is another term used to describe ISIS.

94.     On or about May 21, 2023, while using **ACCOUNT 1**, **SWINFORD** asked John Doe to call him daddy because he was older. When John Doe asked why, **SWINFORD** replied, "Because it'll be hot when we make love." **SWINFORD** and John Doe began talking about getting married. John Doe told **SWINFORD**, "I want to suck your dick and put my tongue in his hole to make you dizzy." **SWINFORD** messaged, "Here you go," and sent an image. The image was deleted, so it was unable to be viewed as part of the search warrant return. After the image was sent, John Doe asked, "This is you???[crying emoji]" **SWINFORD** replied, "Yes, I'm sorry I'm not big. I'm such a failure." John Doe then said, "Damn why do you say that? It is big," and "I like it, it's definitely pink, right?"

95.     On or about May 21, 2023, John Doe asked **SWINFORD**, who was utilizing **ACCOUNT 1**, "Do you want to see my hairy ass?" **SWINFORD** replied, "Yes." John Doe then sent a video of himself where he pulled down his underwear, bent over, and spread his buttocks, which exposed his anus and the back side of his genitalia. **SWINFORD** replied, "WOW" and "You're gonna make me cum."

96.     On or about May 19, 2023, **SWINFORD** began speaking with an Instagram user, @XXXXXXXXXXXXXXXXXXXXXX (Jane Doe)[19], using **ACCOUNT 1**. **SWINFORD** sent a picture of a clothed female to Jane Doe and said he would like to motorboat the girl in the photograph as well as Jane Doe. Jane Doe replied, "I'm 13 sir." **SWINFORD** replied, "We're allowed to marry girls younger than that if they reached

---

[19] The Instagram username, which is known to the FBI, and name provided is being redacted and protected due to her purported status as a minor.

sexual maturity." Jane Doe told **SWINFORD** she is not sexually mature. SWINFORD said, "Yes you are" and "You've reached puberty."

97.    On or about May 19, 2023, while using **ACCOUNT 1**, **SWINFORD** sent images of other clothed females to Jane Doe. He described different sexual acts he would perform on these women. **SWINFORD** told Jane Doe, "I wish I didn't delete the pics of you fuck," to which Jane Doe replied, "Thank god you deleted them." Jane Doe said she was shocked regarding the statement **SWINFORD** made regarding the women in the photographs he spoke about earlier. **SWINFORD** replied, "That I would eat you out? Bc [because] I would fs [for sure]." Jane Doe said, "Stop. It's weird." **SWINFORD** then said, "Sorry but I actually like you. Like deadass on the dl [down low]. I'm fr [for real]. Like not obsessed like you are with him [referring to a boy Jane Doe said she likes] but I'm getting close. I'm serious. I'm not kidding."

98.    On or about May 19, 2023, Jane Doe told **SWINFORD**, "let's stay friends tho please I like talking to you." **SWINFORD** replied, "Im okay with being friends ofc [of course]. Im not gonna force you to date me, there's obvious reason why we can't." **SWINFORD** told Jane Doe he recently just got paid then sent her a picture of him holding money. **SWINFORD** then said, "I was gonna make a joke about offering money to bang you but knowing I actually like you a lot, it might've ended up being serious." **SWINFORD** later said, "okay but I wouldn't disrespect you like that, I would want it to be consensual so you actually feel good because I want you to be happy."

99.    On or about May 19, 2023, Jane Doe said the following to **SWINFORD** while he was utilizing **ACCOUNT 1**, "ur so sweet I'm glad to have a friend like u [heart

emoji]." **SWINFORD** then replied, "Ik [I know] I've made a lot of bad jokes and shit in the past but I want you to know that I don't see you as something to just stick my dick in, like I loved your personality far before I even saw you." **SWINFORD** said, "if I still had those pics, you'd be my background rn [right now]," and "Can I pweeease have a pic to make my background? I'm like obsessed with you."

100.    On or about May 21, 2023, **SWINFORD** continued his conversation with Jane Doe while utilizing **ACCOUNT 1**. **SWINFORD** told Jane Doe multiple times how much he loved her and how beautiful she is. Jane Doe told **SWINFORD** multiple times to stop talking about her and to have a normal conversation with her. **SWINFORD** continued to talk about how beautiful she is even though Jane Doe told him to stop multiple times. During the conversation, Jane Doe mentioned multiple times how she is only 13 years old.

101.    On or about May 21, 2023, **SWINFORD**, while using **ACCOUNT 1**, was talking to Jane Doe about a boy she liked at school. **SWINFORD** stated, "I don't know how that guy isn't drooling for you rn [right now]." Jane Doe asked, "how do you know he doesn't [winking emoji]," to which **SWINFORD** replied, "That's hot." **SWINFORD** later stated, "I'm a cuck[20]." Jane Doe talked about how she wishes she could go to prom and hold the hand of the boy she likes. **SWINFORD** said, "Nahhh now I'm actually thinking it'd be hot watching him do stuff to you," and "Nothing makes me happier than seeing you

---

[20] According to Merriam-Webster, "Cuck" means, "To have sexual relations with the spouse or partner of (someone else, especially a man). It is used to describe someone who enjoys watching their partner have sexual relations with another person.

happy so him pleasuring you would fs [for sure] make you feel so good which turns me on." He then said, "If I knew his insta I'd be asking if he and I can take turns sometime."

102.    On or about May 22, 2023, SWINFORD messaged Jane Doe via **ACCOUNT 1**, stating, "How come you're allowed to be obsessed with him but I can't be obsessed with you." On of Jane Does' replies were, "please try to flirt with me only a little cuz yk [you know] I'm 13 [crying emoji]." SWINFORD said, "The Prophet married a six year old [crying emoji] I'm allowed to like you."

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

103.    Based on my training and experience, I am aware that persons involved in such activities as material support or resources to designated FTOs, transmitting threats in interstate commerce, sexual exploitation of children, and receiving or distributing child pornography,  will typically keep the instrumentalities of their crime, including but not limited to the electronic devices, to include cellular telephones and computers, used in the commission of the aforementioned offenses in their residences. As described above in **ATTACHMENT B**, this application seeks permission to search for records that might be found at the **SUBJECT RESIDENCE**, in whatever form they are found. One form in which the records might be found is data stored on electronic devices or a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and subsequent search of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

104.    I submit that if a computer or other electronic storage medium, such as a smartphone or computer, is found on the **SUBJECT RESIDENCE**, there is probable cause

32

to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted date in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computer's internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operation, file system data structures, and virtual memory "swap"

33

or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into temporary Internet directory or "cache."

## FORENSIC EVIDENCE

105.    As further described in **ATTACHMENT B**, this application seeks permission to locate not only computer files that might serve as direct evidence of a crime described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT RESIDENCE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times

34

the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage devices, including electronic storage media, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indcia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers and electronic devices typically contain information that log: computer user account session times and durations, computer activity

35

associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Lastly, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or

passwords protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer or an electronic device works can, after examining the forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or an electronic device is evidence may depend on other information stored on the computer and the application of knowledge about how a computer or an electronic device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer or an electronic device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

37

## NECESSITY OF SEIZING OR COPYING ENTIRE COMPUTERS OR STORAGE MEDIA

106.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Imaging is the taking of complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

## NATURE OF EXAMINATION

107.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. In addition, this warrant seeks permission to transport seized electronics from the **SUBJECT RESIDENCE** to districts outside the Western District of Oklahoma for forensic analysis and extraction as necessary.

## **REQUEST FOR BIOMETRIC UNLOCK**

108.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial

recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features

41

are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device that is reasonably associated to **SWINFORD** or that he reasonably has or had access to, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

109.  Based on the facts presented above, there is probable cause to believe that **SWINFORD** violated 18 U.S.C. § 2339B, 18 U.S.C. § 875(c), 18 U.S.C. § 2251, and 18 U.S.C. § 2252A(a)(2).

110.  Based on the aforementioned information, I believe there is probable cause to believe that **SUBJECT RESIDENCE** contains evidence of a crime, contraband, fruits of crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime—specifically 18 U.S.C. § 2339B, 18 U.S.C. § 875(c), 18 U.S.C. § 2251, and 18 U.S.C. § 2252A(a)(2).

111.  Further, I believe the said evidence will be found when the attached warrant is executed. Consequently, based on the probable cause stated within this Affidavit, I specifically request authority to search and seize the evidence described above and in **ATTACHMENT B** hereto and incorporated herein by reference.

112.    I, and/or any other duly authorized federal agent or forensic examiner, will execute the warrant requested above. Execution will include powering-up and turning-on devices, and may require authorities to employ techniques, including but not limited to, computer assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

**FURTHER YOUR AFFIANT SAYETH NOT**

Bailey Kennedy, Special Agent
Federal Bureau of Investigation (FBI)

Subscribed and sworn to before me this ___1st___ day of March, 2024.

SUZANNE MITCHELL
United States Magistrate Judge

44

## ATTACHMENT A

## Location to be Searched

The property to be searched is 2288 County Road 1333, Blanchard, Oklahoma 73010 (**SUBJECT RESIDENCE**) including the curtilage and any outbuildings or vehicles. The residence is a one level, white brick, dark gray shingled roof, a dark gray front door, and two gray garage doors. The **SUBJECT RESIDENCE** has a chain link fenced backyard and a concrete driveway leading to the **SUBJECT RESIDENCE**. A photograph of the **SUBJECT RESIDENCE** is attached.



## ATTACHMENT B

## Property to be Seized

1.      There is probable cause to seize the following items, which constitute evidence of a violation of Title 18 U.S.C. § 2339B, 18 U.S.C. § 875(c), 18 U.S.C. § 2251, 18 U.S.C. § 2252A, and 18 U.S.C. § 2252A(a)(2) (**SUBJECT OFFENSES**) involving Landon Kyle Swinford found at the **SUBJECT RESIDENCE**:

     a. Any digital device, that are reasonably associated to **SWINFORD** or that he reasonably has or had access to, used to facilitate any of the **SUBJECT OFFENSES** and forensic copies thereof, including, but not limited to an iPhone XS, Space Gray in color, 256GB of memory, IMEI 357206092881426;

     b. Any firearm, firearm part, or ammunition;

     c. Any edged or serrated hand weapon, to include, but limited to knives or swords;

     d. Any item related to the construction, use, or intended useof an improvised explosive device (IED);

     e. Any record or document pertaining to the possession or acquisition of any weapon, including firearms;

     f. Any record or document pertaining to the possession or acquisition of materials need to construct an IED;

     g. Communications containing a threat to injure another;

h. Any record or document, including diaries, books, notebooks, notes, computer printouts, drawings, photographs, video recordings, and any other records related to material support of a foreign terrorist organization;

i. Any records or documents reflecting or related to any knowledge, intent, motive, planning, willingness, or means of committing the **SUBJECT OFFENSES**;

j. Any financial records or documents, transfer or wire records or documents, or currency related to or used/intended to facilitate the **SUBJECT OFFENSES**;

k. Records and information relating to any social media accounts utilized by Landon Kyle Swinford;

l. Any clothing utilized by Landon Kyle Swinford in furtherance and/or support of providing material support of a foreign terrorist organization;

m. Any documents, records, programs, or applications tending to demonstrate the actual user(s) of computers found at the **SUBJECT RESIDENCE**. As used above, the terms records, documents, programs, applications, or materials include records, documents, programs, applications or materials created, modified or stored in any form;

n. Evidence of others who aided and abetted, counseled, commanded, induced, or procured materials in support of the **SUBJECT OFFENSES**. This specifically includes the electronic devices, computers, wireless phones,

2

digital cameras, and other items and areas listed in this Attachment and Warrant;

o. Any and all image and video files depicting any minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2); and

p. Any and all correspondence, chats, or other writing or documentation relating to the creation or production of sexually explicit images or videos of any minor, and the transportation, distribution, receipt, possession, and access with intent to view said depictions.

2.     Any computers, tablets, mobile phones, including but not limited to an iPhone XS, Space Gray in color, with 256GB of memory, IMEI 357206092881426, associated storage devices, other devices located therein, that are reasonably associated to **SWINFORD** or that he reasonably has or had access to, that can be used to store information and/or connect to the Internet, and/or records and materials.

3.     Evidence identifying the individual(s) who used, owned, or controlled the computer(s) and cellular devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, accounts of Internet Service Providers.

4.     For any computer, computer hard drive, cellular phone, or other physical object upon computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that may contain things otherwise called for by this warrant:

3

a. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b. Evidence of the lack of such malicious software;

c. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

d. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

e. Evidence of the times the COMPUTER was used;

f. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g. Documentation and manuals that may be necessary to access devices that may be necessary to access the COMPUTER;

h. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. Contextual information necessary to understand the evidence described in this attachment.

5.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form such as writing); any mechanical form (such as printing or typing); and any photographic form (such as

4

printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

6.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets server computers, and network hardware.

7.     The term "storage medium" includes nay physical object upon which computer data can be recorded, Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

8.     During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

9.     The warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.